UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

────────────────────────────────

DYLAN SCHUMAKER,

                    Petitioner,

          -vs-

MICHAEL KIRKPATRICK,

                    Respondent.

No. 17-CV-6468(MAT)
**DECISION AND ORDER**

────────────────────────────────

## I.    Introduction

*Pro se* petitioner Dylan Schumaker ("Petitioner" or "Schumaker") seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254 on the basis that he is being unconstitutionally detained in respondent Michael Kirkpatrick's ("Respondent") custody. Petitioner is incarcerated pursuant to a judgment of conviction entered against him on January 10, 2014 in New York State Supreme Court, Erie County (the "trial court"), following a jury trial in which he was convicted of murder in the second degree. Petitioner was sentenced to an indeterminate term of incarceration of 25 years to life, which was reduced on direct appeal to 18 years to life.

In the petition, Petitioner asserts that his continued incarceration is unconstitutional because: (1) the intentional murder verdict was not supported by legally sufficient evidence; (2) the prosecution exercised two peremptory challenges in a discriminatory manner; (3) trial counsel provided ineffective assistance; (4) appellate counsel provided ineffective assistance; (5) his purported waiver of his *Miranda* rights was insufficient,

rendering his custodial statements involuntary; and (6) his right to due process was violated by the admission of prejudicial uncharged bad acts, the use of evidence that was not marked for identification, the knowing use of perjured testimony, and the display of the victim's body and injuries at trial and in summation. For the reasons discussed below, the Court finds that Petitioner has not shown he is entitled to federal habeas relief.

## II. Factual Background and Procedural History

### A. The Underlying Crime, Initial Investigation, and Indictment

At the time of the underlying crime, Petitioner was 16 years old and resided with his mother, his 19-year-old girlfriend, Ashlee Smith ("Ashlee"), and Ashlee's two children, 23-month-old Austin and two-month-old Kristopher. Petitioner is not the biological father of either Austin or Kristopher. On March 19, 2013 at roughly 4:20 p.m., Ashlee went to work at her job at Pizza Hut, leaving Austin and Kristopher in Petitioner's care.

At approximately 8:20 p.m. that same day, Petitioner called 911 to report an unresponsive child. Erie County Sheriff's Deputy Benjamin Pisa ("Deputy Pisa") responded to the call. Upon arriving at the scene, Deputy Pisa ran past Petitioner and his mother, who were standing on the porch, to an upstairs bedroom where he found Austin lying on a bed, bleeding out of his mouth and with large bruises on both sides of his face. Austin's pupils were dilated and he did not appear to have a pulse. Deputy Pisa undertook lifesaving measures (without success) until an ambulance arrived,

at which time he wrapped Austin in a blanket, carried him downstairs, and placed him in the ambulance.

Erie County Sheriff's Deputies Donald Hoelscher ("Deputy Hoelscher") and Jason Bouton ("Deputy Bouton") arrived at the scene shortly after Deputy Pisa. As Deputy Hoelscher passed Petitioner on the porch, he overheard Petitioner say, "oh my God, she's going to kill me." Deputy Bouton overheard Petitioner say, "I can't believe I did this" and "oh my God, I didn't mean for this to happen."

Deputy Bouton asked Petitioner, who was still on the porch, what had happened. Petitioner stated that Austin had fallen down the stairs, but that he was acting normal thereafter and had been bathed and put to bed. Petitioner also told the police that he had sent Ashlee a text message after Austin fell down the stairs. As Austin was moved out of the house, Petitioner stated that he felt like he had killed a thousand babies.

Ashlee was at the scene by this time, but was told she could not ride in the back of the ambulance with Austin. Upon hearing this, Petitioner became agitated. Deputy Pisa handcuffed Petitioner and placed him in the back of a patrol car, but explained that Petitioner was not under arrest and was being restrained only so he could compose himself. After Petitioner calmed down, Deputy Pisa removed the handcuffs. While Petitioner was still in the back of the patrol car, he agreed to turn his cell phone over to the

police.  The police seized the phone to confirm Petitioner's statements about having texted Ashlee.

Deputy Pisa transported Petitioner to the police substation in his patrol car.  At the police substation, Petitioner sat on a bench for roughly an hour before Erie County Sheriff's Department Detective John Graham ("Detective Graham") asked him to speak in private.  As Detective Graham and Petitioner walked to a conference room, Petitioner asked if Austin had died, and Detective Graham said that he had.  Once in the conference room, Detective Graham told Petitioner that he was not under arrest and that he was free to go.  Detective Graham then administered *Miranda* warnings to Petitioner, advising him that he had the right to remain silent, that anything he said could be used against him in a court of law, that he had the right to have counsel present during questioning, and that an attorney would be provided if he could not afford one. Detective Graham read each warning individually and asked Petitioner if he understood it.  Petitioner confirmed that he understood the warnings and, at 11:58 p.m., placed his initials on the card from which the warnings were read.  Petitioner agreed to speak to the police and did not ask that anyone else be present during the questioning.

Speaking to both Detective Graham and Erie County Sheriff's Department Detective Gregory McCarthy ("Detective McCarthy"), Petitioner stated that Austin had fallen down the stairs aat approximately 5:20 p.m. and that he had texted Ashlee to let her

know.  Austin was bleeding from the mouth at that point, likely from biting his tongue.  At 6:30 p.m., Petitioner fed and bathed Austin, and at 8:00 p.m. he put him to bed.  At 8:20 p.m., Petitioner checked on Austin and observed that he was sweaty, limp, and non-responsive.  Petitioner alerted his mother, who told him to call 911.

Detective McCarthy left the room and Erie County Sheriff's Captain Gregory Savage ("Captain Savage") entered.  Petitioner told Captain Savage some additional facts.  In particular, Petitioner told Captain Savage that Austin had fallen down three stairs and that Petitioner had notice blood on his mouth and a mark on his face.  Petitioner further told Captain Savage that Austin had told him to "fuck off" and that Petitioner had spanked the child in response.  Additionally, Petitioner reported that Austin had fallen on his rear end while in the bath tub.

Captain Savage left the room and Detective McCarthy reentered.  Detectives Graham and McCarthy informed Petitioner that they did not believe his story and that they thought Petitioner had hurt Austin out of frustration.  Petitioner initially denied having hurt Austin, but then admitted that he had.  Petitioner indicated that it was too difficult for him to say aloud what had happened, and the police gave him a pen and pad to write on.  Petitioner wrote a statement, which he signed at 2:08 a.m., setting forth a different version of events.  According to this statement, Ashlee had left for work earlier than normal, and Austin was acting rambunctious

and had ripped his bed apart. Petitioner spanked Austin, but he continued to act out. Petitioner then grabbed Austin by the neck and stomach and carried him to the bedroom. Austin was kicking and screaming, and Petitioner threw him onto the bed and smacked him with the back of his fingers. Petitioner then gave Austin juice and put him down for a nap. After Austin awoke from his nap, Petitioner heard two bangs from the stair area and heard Austin scream. He asked Austin if he was hurt and Austin said yes. Petitioner changed Austin's diaper and observed that he seemed fine. Petitioner fed Austin, at which time Austin told him to "fuck off." Petitioner smacked Austin on his buttocks. At approximately 8:15 p.m., Petitioner tossed Austin onto the bed. Shortly thereafter, Petitioner heard a noise - Austin had fallen down the stairs and was bleeding from the tongue. Petitioner shook Austin. Subsequently, when Austin became unresponsive, Petitioner called 911 while his mother called Ashlee.

The police told Petitioner that they did not believe his written statement and that an autopsy of Austin would be performed. Petitioner agreed to a formal interview, and the detectives confirmed with him that he still understood his *Miranda* warnings. In response to questioning by Detectives Graham and McCarthy, Petitioner verbally described shaking, slapping, slamming, and punching Austin. A typed statement based on Petitioner's responses was prepared. According to the typed statement, after Ashlee left for work, Austin was rambunctious, kicking and screaming as his

diaper was changed. Petitioner grabbed Austin by the neck and held down his arms and legs. Austin napped until about 5:00 p.m., and then he and Petitioner ate together. Austin spit food at Petitioner and told him to "fuck off," and Petitioner smacked the child in the face. Petitioner slammed Austin's head into the floor while changing his diaper and spanked him after giving him his bath. Austin was being loud, and so Petitioner placed a pillow over his head (to avoid waking Kristopher) and punched him three times. Petitioner also indicated that Austin had fallen while they were walking down the hallway. Petitioner shook Austin to keep him awake until bedtime. After putting Austin to bed, Petitioner checked on him and he seemed fine. Petitioner returned five minutes later and Austin was breathing funny, his eyes were half open, there was more blood on his lip, and he was sweaty. Austin was not responsive. Petitioner alerted his mother, who was downstairs, and removed Austin's clothes. Petitioner then called 911. Petitioner indicated that he had hurt Austin because he was frustrated and that he had not meant to do it. Petitioner was arrested after making this final statement.

Under Indictment No. 00499-2013, returned on April 19, 2013, Petitioner was charged with murder in the second degree in connection with Austin's death.

B. Pre-trial Proceedings

Prior to trial, Petitioner moved, among other items, to suppress the use of his statements to the police on the basis that

−7−

they were involuntary.  The trial court held a hearing pursuant to *People v. Huntley,* 15 N.Y.2d 72 (1965) on July 24, 2013.  On August 13, 2013, the trial court denied Petitioner's motion to suppress in its entirety.

### C.    Petitioner's Trial, Conviction, and Sentencing

Petitioner's trial commenced on December 2, 2013 and continued through December 9, 2013.  During jury selection, the prosecution exercised peremptory challenges as to two African American women - Eula Hooker ("Ms. Hooker"), juror number four, and Matika Henry ("Ms. Henry"), juror number 14.  Trial counsel raised an objection pursuant to *Batson v. Kentucky*, 476 U.S. 79 (1986), requesting that the prosecution articulate objective, race-neutral reasons for the exclusions.  Prior to questioning the prosecution, the trial court observed with respect to Ms. Hooker that she worked with a "human rights" organization and that, in the Court's view, that was a sufficient reason to use a peremptory challenge.  The prosecution then confirmed that Ms. Hooker had indeed been challenged because she was a member of both a religious organization and a human rights organization, which the prosecution believed would make her overly sympathetic to Petitioner.  With respect to Ms. Henry, the prosecution stated that she was a young, single woman, and that the prosecution was looking for older jurors with more life experience. The trial court determined that the prosecution's reasons were not pretextual and denied the *Batson* challenge.

Deputies Pisa, Hoelscher, and Bouton and Detective Graham testified at trial to the facts uncovered during their investigation, which are set forth above. Forensic pathologist Tara Mahar ("Dr. Mahar") of the Erie County Medical Examiner's Office also testified. Dr. Mahar, who is board certified in anatomic, clinical, and forensic pathology, performed an autopsy on Austin on March 20, 2013. Dr. Mahar testified that Austin had suffered from blunt force and blunt impact injuries to his head, neck, torso, and extremities. Austin had a bruise on the front of his forehead, as well as a pink abrasion and a pink contusion near his right eye. There was an abrasion on the right side of his nose, and contusions (both pink and brown) on his right cheek. Austin's jawline had a pink contusion and the right side of his chin had a dried red abrasion and an adjacent purple-brown contusion. There was a red abrasion near Austin's left ear, and his left ear itself had contusions, an abrasion, and several burst blood vessels. Dr. Mahar observed multiple abrasions near Austin's left eye. She testified that the most "striking external injury" she observed was a purple-blue contusion covering the entirety of Austin's left cheek and extending onto his neck. Austin's lower lip had an abrasion and there was a laceration on the tip of his tongue.

Dr. Mahar observed approximately 10 blunt impact injuries to Austin's neck area, including abrasions and contusions. There were four contusions of the scalp. Upon performing an internal examination, Dr. Mahar noted two areas of bleeding on the brain,

hemorrhage around the perioptic nerve, and multiple retinal hemorrhages. Dr. Mahar testified that most common cause of retinal hemorrhages is blunt force head trauma.

On Austin's torso, Dr. Mahar again observed abrasions and contusions, predominately on the upper portion. There was an abrasion of the midback and contusion of the buttocks. Dr. Mahar observed faint contusions on Austin's extremities.

Dr. Mahar testified that Austin's injuries were incompatible with a fall down the stairs. She explained that on individuals who have fallen down the stairs, she would expect to see blunt impact injuries to the extremities, but that Austin did not have any such injuries. She further explained that a fall down the stairs would not cause the type and extent of head and neck injuries that Austin suffered. With respect to the injuries to Austin's buttocks, Dr. Mahar indicated they were consistent with numerous strikes. Dr. Mahar testified that Austin's head and neck injuries were consistent with having been struck numerous times in the face, head, and neck, having been shaken, and having had his head pushed or slammed to the ground. Dr. Mahar also testified that the injuries were consistent with having been thrown on a bed and having had someone put a pillow over his head and punch it. The cause of Austin's death was blunt impact injuries of the head, resulting in diffuse axonal injury. Dr. Mahar told the jury that her findings were inconsistent with accidental trauma.

Ashlee also testified at Petitioner's trial. Ashlee told the jury that in early 2013, she, Austin, and Kristopher had been living with her father and step-mother, but that she was kicked out of the house when her father and step-mother discovered an unused condom in her bed. Regarding her relationship with Petitioner, Ashlee told the jury that she had known him for three to four years, during which time they had dated on and off and otherwise been friends. Ashlee testified that she and Petitioner had sexual intercourse on one occasion around the time she became pregnant with Kristopher, and that she subsequently stopped having sexual intercourse with him both because she was uncomfortable with the age difference and because Petitioner went to rehab. Ashlee explained that she and Petitioner had believed Petitioner might be Kristopher's father, but that subsequent DNA testing had revealed he was not.

Ashlee testified that after she was kicked out of her father's house, Petitioner asked his mother if Ashlee and the children could stay with them. Ashlee and the children moved in with Petitioner and his mother in approximately February 2013. Ashlee was working at a nearby Pizza Hut, and Petitioner would generally watch Kristopher while she worked, while Austin would stay with either Ashlee's aunt, her father and stepmother, or his biological father. However, Ashlee twice asked Petitioner to watch both children while she went to work.

On March 18, 2013, the day before Austin's death, Ashlee and Petitioner had an argument. Ashlee testified that she had jokingly asked Petitioner if he was sending text messages to another girl and that he had not taken it as a joke. The argument escalated and resulted in Petitioner throwing Ashlee out of the bedroom and locking the door, with Kristopher still inside. Ashlee began banging on the door and telling Petitioner to let her in or she would call the police. Petitioner opened the door and told Ashlee that if she called the police, he would report her for statutory rape. Ashlee entered the room to check on Kristopher, and she and Petitioner began to fight again. Ashlee hit Petitioner with a pillow, and he responded by grabbing the pillow out of her hands and throwing her across the bed into Kristopher's swing and car seat. Petitioner walked to where Ashlee was laying on the ground and screamed at her to get out. He then picked her up off the ground and threw her to the side, before leaving the room with a pillow, a blanket, and his dog.

That night and into the next morning, Ashlee and Petitioner sent each other a number of text messages about the status of their relationship. They spoke the next morning while Petitioner was getting ready for school, and he told Ashlee that he wanted her out by the end of the week. Ashlee asked him for a little more time, as she was waiting to receive her income tax refund.

Ashlee cared for Austin and Kristopher while Petitioner was at school on March 19, 2013. After school, she and Petitioner continued to send text messages. Ashlee told Petitioner that she was going to call off work, but Petitioner told her not to do so. Ashlee went to work that day at approximately 4:20, leaving the children in Petitioner's care. Austin did not have any injuries when Ashlee left him.

While at work, Ashlee received a text message from Petitioner stating that Austin had fallen down the stairs. Ashlee asked if the child was okay and Petitioner indicated that he was. Later, Ashlee sent Petitioner a text message how things were going, and Petitioner told her that Austin had told him to fuck off, so Petitioner had "smacked his ass good." At approximately 8:20 that evening, while still at work, Ashlee received a call from Petitioner's mother telling her she needed to come home right away and that an ambulance was on the way for Austin.

Ashlee's aunt gave her a ride home from work. Ashlee witnessed Austin being placed into the ambulance, but the EMTs would not allow her to ride with him to the hospital. The police officers asked Ashlee about the text messages she had received from Petitioner and she gave them her phone and consented to them performing a search of it. She then packed up Kristopher's things and went to the hospital, where she learned Austin had died.

Petitioner testified in his own defense at trial. He reported having been to rehab at the age of 15 by order of a family court judge. Petitioner also indicated that his pediatrician had prescribed him a medication called Intuniv for attention deficit hyperactivity disorder ("ADHD") and anger problems, but that he had chosen to stop taking it in February 2013.

Petitioner stated that he and Ashlee had an on and off relationship and confirmed that in the time period before he went to rehab, they had sexual intercourse on one occasion. He learned she was pregnant and believed the child might be his. However, DNA testing results received after Petitioner's arrest indicated that Kristopher was not his child.

With respect to the argument with Ashlee on March 18, 2013, Petitioner described it as a "punch/shove and back and forth." He told the jury that he felt he and Ashlee should not be living together because of his youth and because he didn't like subjecting the children to their arguments. He also acknowledged having told a neighbor and acquaintance shortly after the argument that Austin was a "dick" because Ashlee gave him whatever he wanted.

With respect to the events leading to Austin's death, Petitioner testified that on the evening of March 19, 2013, Austin was sleeping when Ashlee left for work. Upon waking, Austin was walking toward Petitioner when he fell down the steps. Petitioner heard a noise and walked to the steps, where he found Austin laying

on the ground with a mark on his cheek and blood in his mouth. Austin cried a little, but then seemed fine. Petitioner cleaned the blood from his mouth and then texted Ashlee to tell her about the incident.

Petitioner then gave Austin a cup of either juice or milk and put cartoons on the television for Austin to watch. Petitioner was sending text messages during this time, including text messages in which he attempted to sell synthetic marijuana and text messages in which he attempted to arrange a sexual tryst with a girl other than Ashlee.

At dinner time, Petitioner went to the kitchen to warm food for Austin, and then fed it to him on the bed upstairs. Austin spit the food out, perhaps because of his mouth injuries. Austin told Petitioner to "fuck off" while eating, so Petitioner slapped him in the face with the back of his hand, after which Austin continued to eat.

At some point in the evening, Petitioner needed to change Austin's diaper. Austin did not want his diaper changed and was trying to get up. Austin was on the wooden floor at this time, and Petitioner testified that he "slammed" Austin down to get the diaper on him, and that Austin hit his head.

Petitioner testified that at another point in the evening, he became angry at Austin for reasons he could not recall. He placed

a pillow over Austin's head and punched him multiple times in the head through the pillow.

Petitioner told the jury that he had not meant to kill Austin and that he did not believe he had the strength to kill anyone. He stated that there was "some sort of intent in it because [he] did it," but that he did not think that Austin would end up dead. Petitioner stated that he had limited experience with children and that he had been angry and wanted to discipline Austin but did not know how. He also testified that he had placed the pillow over Austin's head thinking that it would provide some protection from his blows.

With respect to his interactions with the police, Petitioner testified that Detective Graham provided him with the *Miranda* warnings and that, as to each warning, Petitioner stated that understood them. Petitioner claimed, however, that he had in fact not understood the warnings and that he was merely trying to be cooperative. Petitioner confirmed that at the end of his questioning, he indicated that the police had treated him "fine" and "better than most detectives would have given the situation."

On cross-examination, Petitioner acknowledged having told his mother in a phone call on July 29, 2013 that he was "a 16-year-old blond" and that "probably all [he has] to do is cry in front of that jury and they're going to feel sorry for [him.]" Petitioner testified he had made this statement of anger.

On December 9, 2013, upon consideration of all the evidence, the jury found Petitioner guilty of murder in the second degree. On January 10, 2014, the trial court sentenced Petitioner indeterminate term of incarceration of 25 years to life.

### D.   Direct Appeal

Petitioner took a counseled direct appeal of his convictions, arguing that: (1) the evidence was legally insufficient to support a guilty verdict as to intentional murder; (2) the prosecution's use of peremptory challenges was discriminatory; (3) trial counsel provided ineffective assistance; (4) he did not properly waive his *Miranda* rights and his statements to the police were involuntary; (5) the trial court erred in allowing in testimony regarding the argument between Ashlee and Petitioner on March 18, 2013; and(6) Petitioner's sentence was unduly harsh, excessive, and severe.

The Appellate Division, Fourth Department (the "Appellate Division") entered a decision on February 11, 2016 rejecting the first five of Petitioner's arguments.  The Appellate Division found that: (1) the evidence of record, including Dr. Mahar's testimony and Petitioner's actions on the night at issue, was legally sufficient to sustain a finding of intentionality; (2) Petitioner failed to preserve for review his objection the trial court's procedure for determining the *Batson* challenge; (3) as to the parts of the *Batson* challenge preserved for review, the trial court

properly found that the prosecution's explanations were race-neutral and not pretextual; (4) trial counsel did not provide ineffective assistance; (5) the police who questioned Petitioner were under no obligation to provide his *Miranda* warnings a second time before he provided a written statement; and (6) Petitioner had waived his objection to the admission of testimony regarding his March 18th fight with Ashlee because he had consented thereto.

The Appellate Division did agree, however, that Petitioner's sentence was unduly harsh and severe, particularly in light of his youth and lack of parental guidance. Accordingly, as a matter of discretion and in the interests of justice, the Appellate Division modified the judgment of conviction by reducing the sentence to an indeterminate term of incarceration of 18 years to life. *See People v. Schumaker*, 136 A.D.3d 1369 (4th Dep't 2016).

Petitioner sought leave to appeal to the New York Court of Appeals (the "Court of Appeals") with respect to the claims he raised before the Appellate Division. The Court of Appeals denied his request on May 3, 2016. *See People v. Schumaker*, 27 N.Y.3d 1075 (2016).

### E.   Motion to Vacate Criminal Judgment

On October 19, 2015, Petitioner moved pursuant to New York Criminal Procedure Law § 440.10 for vacatur of his judgment of conviction. Petitioner argued that trial counsel was ineffective, that the evidence was insufficient to support the conviction, and

that the prosecution had knowingly used perjured testimony by Ashlee. The trial court denied Plaintiff's § 440.10 motion on March 3, 2016, and that Fourth Department denied Petitioner's request for leave to appeal the denial.

### F.    Petition for Writ of Error *Coram Nobis*

On July 22, 2016, Petitioner filed a *pro se* petition for a write of error *coram nobis*, contending that his appellate counsel had provided ineffective assistance. The Appellate Division summarily denied this petition on December 23, 2016. Petitioner did not seek leave to appeal the denial of his *coram nobis* petition to the Court of Appeals.

### G.    The Instant Petition

Petitioner commenced this action on July 5, 2017. Docket No. 1. Petitioner contends that he is entitled to habeas relief because: (1) the intentional murder verdict was not supported by legally sufficient evidence; (2) the prosecution exercised two peremptory challenges in a discriminatory manner; (3) trial counsel provided ineffective assistance; (4) appellate counsel provided ineffective assistance; (5) Petitioner did not knowingly waive his *Miranda* rights and his custodial statements were involuntary; (6) his right to due process was violated by the admission of prejudicial uncharged bad acts, the use of evidence that was not marked for identification, the knowing use of perjured testimony,

-19-

and the display of the victim's body and injuries at trial and in summation.

## III. Discussion

### A. Standard of Review

"Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254(d)(1), a federal court may not grant a state prisoner's habeas application unless the relevant state-court decision was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." *Knowles v. Mirzayance*, 556 U.S. 111, 121 (2009) (internal quotation omitted). "The question is 'not whether the state court was incorrect or erroneous in rejecting petitioner's claim, but whether it was objectively unreasonable in doing so.'" *Edwards v. Superintendent, Southport C.F.*, 991 F. Supp. 2d 348, 367 (E.D.N.Y. 2013) (quoting *Ryan v. Miller*, 303 F.3d 231, 245 (2d Cir. 2002)). "The petition may be granted only if 'there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents.'" *Id.* (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011)).

### B. Legal Sufficiency of the Evidence

Petitioner's first claim is that his conviction was not supported by legally sufficient evidence. When considering whether evidence was legally sufficient to sustain a conviction, "courts

are required to consider the trial evidence in the light most favorable to the state and uphold the conviction if 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Nunez v. Conway*, 923 F. Supp. 2d 557, 564 (S.D.N.Y. 2013) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). The Court looks to state law "to determine the elements of the crime." *Ponnapula v. Spitzer*, 297 F.3d 172, 179 (2d Cir. 2002) (internal quotation omitted). On federal habeas review, there is a doubly deferential standard of review for a legal insufficiency claim, because the Court "may not grant the writ unless [it] conclude[s] that *no* reasonable court could have held that *any* reasonable jury could have read the evidence to establish petitioner's guilt beyond a reasonable doubt." *Garbutt v. Conway*, 668 F.3d 79, 82 (2d Cir. 2012) (emphasis in original). "Petitioner bears a very heavy burden in convincing a federal habeas court to grant a petition on the grounds of insufficient evidence." *Ponnapula*, 297 F.3d at 179 (internal quotation omitted).

Turning first to the elements of Petitioner's crime, under New York law, "[a] person is guilty of murder in the second degree when . . . [w]ith intent to cause the death of another person, he causes the death of such person or of a third person." N.Y. Penal Law § 125.25(1). Here, Petitioner contends that no reasonable juror could have found that he acted with the intent to cause

Austin's death.  The Court finds no error in the Appellate Division's rejection of this claim.

The Appellate Division applied the correct legal standards in rejecting Petitioner's legal sufficiency claim, noting that the relevant inquiry was "whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Schumaker*, 136 A.D.3d at 1369.  With respect to the issue of intent, the Appellate Division explained that Dr. Mahar's testimony regarding the severity of the injuries to Austin's head and that Austin's injuries were not consistent with a fall but had instead been caused by multiple impacts, as well as Petitioner's actions in repeatedly striking Austin over a period of several hours while also texting about sex and drugs, supported the conclusion that he had intended to cause Austin's death.

When assessing intent, "[a] jury is entitled to infer that a defendant intended the natural and probable consequences of his acts."  *People v. Bueno*, 18 N.Y.3d 160, 169 (2011); *see also United States v. Miller*, 567 F. App'x 45, 46 (2d Cir. 2014) ("A defendant may be presumed to intend the natural and probable consequences of his [or her] actions, and intent may be inferred from the totality of the conduct of the accused.") (internal quotation omitted and alteration in original).  In this case, the evidence at trial, when viewed in the light most favorable to the

prosecution, showed that Petitioner, over the course of several hours and while also calmly conducting his social life and attempting to sell drugs, viciously beat a two-year-old child, culminating in a series of blows to the child's head sufficient to cause hemorrhaging and diffuse axonal injury. "[A] rational juror could readily infer from the nature of the petitioner's beating of [the victim] that the petitioner had the requisite intent to commit intentional murder." *Claudio v. Portuondo*, 74 F. App'x 120, 123 (2d Cir. 2003); *see also Miles v. Ercole*, No. 09 CIV. 1513 KMK PED, 2011 WL 7975088, at *9 (S.D.N.Y. Oct. 18, 2011) (finding the petitioner's intent shown by "[t]he severity of the beating" and other circumstantial evidence, including that the petitioner's relationship with the victim had recently ended); *Franco v. Walsh*, No. 00 CIV. 8930AGSJCF, 2002 WL 596355, at *8 (S.D.N.Y. Apr. 17, 2002) (the "objective results of the beating administered by" the petitioner "were evidence from which the jury could infer . . . intent").

In addition to the evidence specifically identified by the Appellate Division, the Court further notes that the jury was aware that Petitioner had recently fought with Austin's mother and that he had told a neighbor he considered the child a "dick" whose mother spoiled him. The jury could have rationally considered this evidence in finding intent. *See Miles*, 2011 WL 7975088 at *9 (evidence that the petitioner and the victim had recently argued

and that the petitioner had told a third party he wanted to hurt or kill the victim was circumstantial evidence of intent).

The Appellate Division's rejection of Petitioner's legal insufficiency claim was neither contrary to nor an unreasonable application of clearly established federal law.  Accordingly, the Court finds no basis to grant relief as to this claim.

### C.  Use of Peremptory Challenges

Petitioner's next argument is that the trial court erred in denying his *Batson* challenge to the dismissal of Ms. Hooker and Ms. Henry.  Again, the Court finds no basis for federal habeas relief.

In *Batson*, "the Supreme Court held that racial discrimination in jury selection in state courts violates the Equal Protection Clause of the Fourteenth Amendment to the Constitution." *Jones v. West*, 555 F.3d 90, 96 (2d Cir. 2009) (citing *Batson*, 476 U.S. at 85-87).  A *Batson* claim is evaluated using a three-step process:

> First, the defendant must make out a prima facie case by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose. Second, once the defendant has made out a prima facie case, the burden shifts to the State to explain adequately the racial exclusion by offering permissible race-neutral justifications for the strikes. Third, if a race-neutral explanation is tendered, the trial court must then decide ... whether the opponent of the strike has proved purposeful racial discrimination.

*Johnson v. California*, 545 U.S. 162, 168 (2005) (internal quotations, citations, and alteration omitted).

Here, Petitioner contends both that the prosecution engaged in racial discrimination during jury selection and that the trial court improperly inserted itself into the *Batson* inquiry by suggesting race-neutral justifications to the prosecution. The Court considers each of these arguments below.

### 1.    The Trial Court's Procedure

As previously set forth, upon trial counsel's assertion of a *Batson* challenge, and before asking the prosecution to articulate race-neutral justifications for the exclusion of Ms. Hooker and Ms. Henry, the trial court *sua sponte* stated that it considered Ms. Hooker's participation in a human rights organization a proper and sufficient basis to remove her from the jury pool. Petitioner contends that the trial court's actions were improper.

The Appellate Division rejected Petitioner's challenge to the trial court's procedure on the basis that he had not preserved the objection. Because this constitutes an independent and adequate state basis for denial of this claim, the claim is not cognizable on federal habeas review.

Where the state courts' rejection of a federal constitutional claim rests "on a state law ground that is independent of the federal question and adequate to support the judgment . . . principles of comity and federalism compel [the Court] to defer to that state law ground and thus to decline to review the federal claim." *Whitley v. Ercole*, 642 F.3d 278, 285 (2d Cir. 2011)

(internal quotations omitted). New York's well-established contemporaneous objection rule, which "provides that a party seeking to preserve a claim of error at trial must lodge a protest to the objectionable ruling"at the time of such ruling . . . or at any subsequent time when the [trial] court had an opportunity of effectively changing the same" (*id.,* internal quotation omitted), may serve as such an adequate and independent state law ground. *See Downs v. Lape*, 657 F.3d 97, 104 (2d Cir. 2011) ("the contemporaneous objection rule is a firmly established and regularly followed New York procedural rule" and may "constitute[] an independent and adequate state law ground.").

Under New York law, "to preserve a particular issue for appeal, defendant must specifically focus [the trial court's attention] on the alleged error." *Garvey v. Duncan*, 485 F.3d 709, 714 (2d Cir. 2007). Petitioner did not so in this case. A review of the trial transcript shows no contemporaneous objection to the trial court's procedure in addressing the *Batson* challenge. Moreover, there is no evidence in the record to support the conclusion that the Appellate Division engaged in an "exorbitant misapplication" of the contemporaneous objection rule. *See Downs*, 657 F.3d at 102. Petitioner's challenge to the procedure utilized by the trial court in determining his *Batson* challenge is thus not reviewable by this Court.

## 2. The Merits of the *Batson* Challenge

Turning to the merits of Petitioner's *Batson* challenge, the Appellate Division held that trial court "properly determined that the prosecutor's explanations for exercising peremptory challenges with respect to the two prospective jurors were race-neutral and not pretextual." *Schumaker*, 136 A.D.3d at 1371. This conclusion was neither contrary to nor an unreasonable application of clearly established federal law.

When assessing a *Batson* challenge, "the trial court's decision on the ultimate question of discriminatory intent represents a finding of fact of the sort accorded great deference on appeal." *Hernandez v. New York*, 500 U.S. 352, 364 (1991). In this case, the race-neutral justifications set forth by the prosecution were adequate to explain the exclusion of Ms. Hooker and Ms. Henry. With respect to Ms. Hooker, the record shows that she was a member of an organization called Women for Human Rights and Dignity. The prosecution's conclusion that Ms. Hooker's participation in this organization made her more likely to be sympathetic to Petitioner was reasonable and race-neutral.

Turning to Ms. Henry, the prosecution explained that it had excluded her from the jury on the basis of her relative youth (Ms. Henry was 27 years old) and inexperience, including the fact that she was single. *Batson* does not prohibit the use of peremptory strikes based on youth and inexperience. *See Harris v.*

-27-

*Burge*, No. CV-03-4910FB, 2004 WL 884437, at *2 (E.D.N.Y. Mar. 25, 2004).  Moreover, "the marital status of a prospective juror is considered a race-neutral fact that may be taken into account during jury selection." *Grate v. Hunt*, No. 06-CV-4981 (JS), 2010 WL 185651, at *3 (E.D.N.Y. Jan. 11, 2010) (internal quotation omitted).  There is no basis on the record before the Court to conclude that the trial court's resolution of Petitioner's *Batson* challenge, or the Appellate Division's affirmance thereof, was constitutionally improper.

### D.  Ineffective Assistance of Trial Counsel

Petitioner's next argument is that trial counsel's assistance was constitutionally ineffective.  Petitioner identifies numerous errors purportedly committed by trial counsel, including: (1) failure to pursue an extreme emotional disturbance ("EED") defense; (2) failure to obtain a mental health evaluation/mental health records or to obtain an expert witness to testify as to Petitioner's emotional instability; (3) failure to call Petitioner's mother as a witness or to seek a missing witness charge; (4) failure to argue that Petitioner's statements were the product of an unlawful detention pursuant to *Dunaway v. New York*, 442 U.S. 200 (1979); (5) failure to object to prosecutorial misconduct during the Grand Jury proceedings and in summation; and (6) failure to seek a jury charge with regard to intoxication.  For the reasons discussed below, the Court finds Petitioner's ineffective assistance of counsel claim meritless.

### 1. Legal Standard

The Sixth Amendment provides that in all criminal prosecutions, the accused shall enjoy the right to the assistance of counsel. U.S. Const., amend. VI. A lawyer's representation is constitutionally deficient where it (1) falls "below an objective standard of reasonableness;" and (2) there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 688 (1984). Recognizing the "tempt[ation] for a defendant to second-guess counsel's assistance after conviction or adverse sentence," *id.* at 689, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id*. To fulfill the prejudice prong of the *Strickland* standard, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* "That requires a 'substantial,' not just 'conceivable,' likelihood of a different result." *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011) (quotation omitted).

Where, as here, the state court has rejected a claim of ineffective assistance of counsel, a "doubly deferential [standard of] judicial review" applies on federal habeas review. *Knowles*, 555 U.S. at 123. Accordingly, to prevail on an claim of ineffective

assistance of counsel, petitioner must show that the state court's application of *Strickland* was objectively unreasonable.

## 2. Failure to Pursue an EED Claim

Petitioner maintains that trial counsel was ineffective for having failed to pursue an EED defense. "Under New York law, extreme emotional disturbance is a partial affirmative defense to murder in the second degree." *Shiwlochan v. Portuondo*, 345 F. Supp. 2d 242, 265-66 (E.D.N.Y. 2004). "To avail himself of the defense, a defendant must prove by a preponderance of the evidence that he acted under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse." *Id.* at 266 (internal quotation omitted). "The elements required to establish a successful EED defense are: 1) that there was an objectively reasonable explanation or excuse for the emotional disturbance; and 2) that the defendant's conduct was influenced by an extreme emotional disturbance at the time the crime was committed." *Id*.

In this case, the Appellate Division found that Petitioner could not demonstrate ineffective assistance of counsel with respect to the failure to pursue an EED defense, explaining that (1) such a defense would have had little or no chance of success and (2) Petitioner failed to demonstrate that counsel's choice was not strategic. The Court finds no error in this determination.

As set forth above, in order to establish an EED defense, Petitioner would have been required to show that he was under an EED and that there was a reasonable explanation for the EED.

However, the evidence of record does not support either of those conclusions. As discussed above, during the time he was beating Austin to death, Petitioner was also sending hundreds of text messages in which he attempted to arrange a drug sale and a sexual tryst. As the Appellate Division aptly explained, Petitioner's behavior in this case was simply inconsistent with the loss of control associated with an EED defense.

Petitioner also has not identified a reasonable explanation for his purported loss of control. To establish an EED defense, Petitioner needed to show that his actions were "an understandable human response deserving of mercy." *People v. Casassa*, 49 N.Y.2d 668, 680–81 (1980). Beating a toddler to death is not an understandable human response to mild misbehavior (*i.e.* spitting out food, engaging in back talk, and resisting having a diaper changed), even taking into account Petitioner's youth. *See People v. Mohamud,* 115 A.D.3d 1227, 1228(4th Dep't 2014) (EED defense not established where defendant beat his 10-year-old stepson to death after the child refused to do his homework and ran from the house).

Trial counsel cannot be faulted for having declined to pursue an EED defense that had little or nor chan. *See Shiwlochan v. Portuondo*, 345 F. Supp. 2d 242, 270 (E.D.N.Y. 2004) (finding no ineffective assistance of counsel where "there was no basis for arguing that petitioner suffered from an extreme emotional disturbance").

Moreover, the Appellate Division was correct that counsel's failure to pursue an EED defense was likely a strategic decision. Trial counsel's theory of the case, for which he vigorously advocated, was that Petitioner lacked the intent to kill Austin. Indeed, Petitioner still maintains that this was the case. However, EED is an affirmative defense that applies only where the facts otherwise establish that the defendant committed second degree murder. While it is "permissible as a legal matter for an attorney to pursue alternative and even factually inconsistent defenses," *Murden v. Artuz*, 497 F.3d 178, 198 (2d Cir. 2007), trial counsel could have reasonably concluded that it would be confusing for the jury for him to simultaneously claim both that Petitioner had not intended to kill Austin and that Petitioner had intended to kill Austin, but only because he was under the influence of an EED. Particularly in light of Petitioner's trial testimony, which established that he engaged in sporadic acts of violence towards Austin over the course of the evening, trial counsel's decision to pursue the more plausible defense (that Petitioner had not realized his actions could potentially kill the child) does not amount to ineffective assistance.

### 3. Failure to Obtain a Mental Health Evaluation or to call a Mental Health Expert Witness

Petitioner next argues that trial counsel was ineffective because he did not obtain Petitioner's mental health records, obtain a mental health evaluation, or call a mental health expert witness, all of which would have allegedly supported an EED

defense. Petitioner did not raise this issue on direct appeal, but did raise it in his post-trial § 440.10 motion. The trial court denied that motion, finding that because an EED defense would have had little to no chance of success, trial counsel could not be faulted for having failed to pursue evidence related thereto.

The trial court's analysis of this claim was neither contrary to nor an unreasonable application of clearly established federal law. Defense attorneys have limited time and resources, and are not required "to investigate comprehensively every lead or possible defense." *Greiner v. Wells*, 417 F.3d 305, 321 (2d Cir. 2005). Moreover, defense attorneys are "entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies." *Harrington v. Richter*, 562 U.S. 86, 107 (2011). In this case, for the reasons discussed at length above, there was no plausible basis to pursue an EED defense. Accordingly, trial counsel was not required to expend time and resources investigating evidence to support such a defense, and his failure to do so does not amount to ineffective assistance.

With regard to the specific issue of failing to call an expert witness, "in general, whether or not to hire an expert is the type of strategic choice by counsel that may not be second-guessed on habeas corpus review." *Murden v. Artuz*, 253 F.Supp.2d 376, 389 (E.D.N.Y. 2001). Petitioner has failed to demonstrate that trial counsel's actions fell outside the bounds of appropriate advocacy.

**4.    Failure to Call Petitioner's Mother or Seek a Missing Witness Charge**

Petitioner contends that trial counsel erred in failing to call his mother, Kara Pickering ("Ms. Pickering"), as a trial witness or, in the alternative, in failing to seek a missing witness charge as to Ms. Pickering. Again, this issue was first raised by Petitioner in his § 440.10 motion, where he argued that his mother could have testified regarding his history of drug use and his psychiatric diagnoses, and was rejected by the trial court.

"The decision not to call a particular witness is typically a question of trial strategy that . . . courts are ill-suited to second-guess." *United States v. Luciano*, 158 F.3d 655, 660 (2d Cir. 1998); *see also United States v. DeJesus*, 57 F. App'x 474, 478 (2d Cir. 2003) ("A trial counsel's decision whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial. Because of this inherently tactical nature, the decision to not call a particular witness generally should not be disturbed.") (internal citation and quotation omitted). In this case, the sole information Petitioner suggests his mother could have provided is support for a potential EED defense. However, and as set forth above, trial counsel reasonably could have decided not to pursue any such defense. Petitioner has not identified other relevant information that Ms. Pickering (who did not witness the events that culminated in Austin's death) could have provided. Trial counsel therefore

-34-

cannot be faulted for having failed to call Ms. Pickering as a witness.

There was also no basis for Petitioner's trial counsel to seek a missing witness charge.  Under New York law, a party seeking a missing witness charge must show "that the uncalled witness is knowledgeable about a material issue upon which evidence is already in the case; that the witness would naturally be expected to provide noncumulative testimony favorable to the party who has not called him, and that the witness is available to such party." *People v. Gonzalez*, 68 N.Y.2d 424, 427 (1986).  In this case, Petitioner has not shown that Ms. Pickering could reasonably have been expected to provide testimony favorable to the prosecution. If anything, the opposite is true - Ms. Pickering, Petitioner's mother, would naturally be expected to provide testimony favorable to the defense.  Trial counsel was not ineffective because "there was no basis for petitioner's attorney to seek, or the trial judge to give, a missing witness charge." *Lebron v. Girdich*, No. 03 CIV. 2765 (NRB), 2003 WL 22888809, at *5 (S.D.N.Y. Dec. 5, 2003).

### 5.    Failure to Request a *Dunaway* Hearing

Petitioner's next argument is that counsel was ineffective because he did not contend that Petitioner's statements to the police were the product of an unlawful detention under *Dunaway*. The Appellate Division considered and rejected this argument, finding that a request for a *Dunaway* hearing would have been

futile.  This determination was neither contrary to nor an unreasonable application of clearly established federal law.

In *Dunaway*, "the Supreme Court held that the police violated the Fourth and Fourteenth Amendments when, without probable cause to arrest, they seized the petitioner and transported him to the police station for interrogation.  As a result, when an accused in New York challenges the presence of probable cause to arrest, the accused is, under certain circumstances, entitled to a hearing on whether to suppress an admission that was obtained after the arrest."  *Thomas v. Lord*, 396 F. Supp. 2d 327, 335 (E.D.N.Y. 2005) (internal citations omitted).

"The Court finds that counsel did not err in failing to request a *Dunaway* hearing because the facts and circumstance of the Petitioner's interrogation were fully developed in the lengthy *Huntley* hearing."  *Id*.  Trial counsel in fact vigorously questioned Deputy Pisa during the *Huntley* hearing about the transport of Petitioner, asking Deputy Pisa whether Petitioner was under arrest at that time, whether he was free to leave, and whether he had asked to leave.  Deputy Pisa testified that Petitioner was not under arrest and that he would have been released had he asked to go.  In its ruling on Petitioner's motion to suppress, the trial court expressly held that Petitioner was not in custody or under arrest during the transport.  The issue of whether Petitioner was in custody during the transport was therefore squarely litigated, and "trial counsel did not provide ineffective assistance by

declining to request a second hearing to determine whether probable cause existed for the [purported] arrest." *Perez v. Greiner*, No. 02 CIV. 1436, 2003 WL 22427759, at *16 (S.D.N.Y. Oct. 23, 2003) (failure to request a *Dunaway* hearing was not ineffective assistance where the trial court had already expressly considered the issue).

Accordingly, the Appellate Division's determination that a request for a *Dunaway* hearing would have been futile was reasonable. *See Thomas*, 396 F.Supp.2d at 336 ("From the testimony adduced at the *Huntley* hearing, it appears that counsel properly decided that it would be not possible to establish that the Petitioner was arrested or in custody based on these facts. Under these circumstances, counsel properly decided, as a tactical matter, that it would be futile to request a [*Dunaway*] hearing.").

### 6. Failure to Object to Prosecutorial Misconduct

Petitioner alleges that the prosecution in his case engaged in misconduct during the grand jury proceedings and in summation, and that trial counsel failed to object. With respect to the grand jury proceedings, although Petitioner does not specify the alleged misconduct in the instant petition, on direct appeal, he argued that the prosecutor had made false statements to the Grand Jury in order to secure an indictment. The Appellate Division rejected this argument on the basis that there was no evidence that trial counsel had access to the grand jury minutes.

The Court finds no error in the Appellate Division's consideration of this claim. While the transcript of the *Huntley* hearing indicates that trial counsel was provided with a copy of Detective Graham's grand jury testimony, there is no indication that he was ever provided with any other part of the grand jury minutes. The record further shows that trial counsel moved to dismiss the indictment on the basis of insufficiency of proof provided to the grand jury and/or the legal instructions given to the grand jury, and that, with the consent of the prosecution, the trial court performed an *in camera* inspection of the grand jury minutes. Trial counsel cannot be faulted for having failed to object to misconduct he was unaware of. Moreover, "defense counsel had no control over the prosecution's presentation of evidence to the grand jury and, thus, cannot be held ineffective based on improprieties that may have occurred at the grand jury presentation." *Goodwine v. Lee*, No. 10CIV6019VBLMS, 2016 WL 6840478, at *34 n.33 (S.D.N.Y. Feb. 10, 2016).

Turning to the prosecutor's remarks in summation, Petitioner argued on direct appeal that the prosecutor engaged in misconduct when she (1) allegedly denigrated the defense, (2) improperly commented on the issue of sympathy, and (3) improperly addressed the issue of potential sentencing. The Appellate Division did not specifically address this claim in its decision, but generally noted that, having reviewed all of Petitioner's ineffective assistance of counsel claims, it had concluded that "viewing the

evidence, the law and the circumstances of this case, in totality and as of the time of the representation, . . . defendant received meaningful representation." *Schumaker*, 136 A.D.3d at 1373.

"Judicial scrutiny of counsel's performance must be highly deferential" and the Court must "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689. There are numerous strategic considerations that might lead "a reasonable lawyer to forgo objections" to a prosecutor's summation, including "the conclusion that additional objections might have annoyed the judge or jury; the possibility that the prosecutor, given enough rope, would alienate the jury; the desire not to call attention to unfavorable evidence or to highlight unfavorable inferences." *Taylor v. Fischer*, No. 05 CIV.3034(GEL), 2006 WL 416372, at *5 (S.D.N.Y. Feb. 21, 2006).

In this case, in summation, the prosecution commented on Petitioner's testimony that he hadn't meant to kill Austin, stating "Did any of you really expect that he would get up there and admit that he intended to kill Austin? Of course not." Petitioner characterizes this statement as a denigration of his decision to testify in his own defense, but it is clear from context that the prosecutor was commenting on the jury's ability to infer intent from the totality of the circumstances, and the fact that an

express statement of intent by Petitioner was not necessary for a guilty verdict.  This was a fair comment by the prosecutor, and not an impermissible attempt to denigrate Petitioner.  To the contrary, the prosecutor also acknowledged that "[m]aybe [Petitioner] can't even admit [that he intended to kill Austin] to himself."

Petitioner also takes issue with the prosecutor's statement that it was "difficult to listen" to Petitioner's accounts of beating Austin, contending that this also constituted an impermissible comment of his decision to testify on his own behalf and was unduly prejudicial.  These remarks were not objectionable, and trial counsel cannot be faulted for having failed to raise a meritless objection.  The prosecutor's remarks were made in the context of informing that jury that it should not be swayed by sympathy for either Petitioner or Austin, the victim, which is indisputably a proper statement by the prosecution.  Moreover, it is indisputable that the average juror would find it difficult to listen to testimony describing the beating death of a toddler.  The prosecutor never suggested that Petitioner did not have the right to present this evidence, and in fact also noted that evidence presented by the prosecution had been difficult to listen to.

The final statement by the prosecutor to which Petitioner objects is her observation that "someone during jury selection raised the issue of the death penalty.  There is no death penalty here.  There is no life without parole here.  But whatever your verdict, if there is to be a sentence it will be up to the judge

following the law to fashion an appropriate sentence.  That is not your job and can have absolutely no impact on your deliberations here."  Petitioner argues that this statement was essentially an attempt to free the jurors from the potential guilt of causing a young man to receive the harshest of sentences. Petitioner's argument ignores the fact that the prosecutor expressly told the jury that potential sentencing should have absolutely no impact on its deliberations.  Moreover, even assuming this statement was objectionable, trial counsel could reasonably have decided to forego an objection as a matter of strategy.  In particular, trial counsel may not have wanted to underscore in the jury's minds the fact that Petitioner was not eligible for the most severe punishments.

Trial counsel's failure to object to the prosecutor's summation remarks described above fell within the bounds of reasonable advocacy.  The Appellate Division's decision to that effect was neither contrary to nor an unreasonable application of clearly established federal law.

### 7.  Failure to Request an Intoxication Charge

Petitioner's final claim with respect to trial counsel is that he was ineffective for failing to request an intoxication charge. Petitioner raised this argument in his § 440.10 motion, contending that he had smoked synthetic marijuana and imbibed alcohol while babysitting Austin and Kristopher, and that trial counsel should have requested an intoxication charge on that basis.  The trial

court rejected this argument, finding that the record contained insufficient information to support such a charge, and that counsel was therefore not ineffective for failing to seek it.

"Under New York law, voluntary intoxication is not a defense to a criminal charge. However, evidence of intoxication of the defendant may be offered by the defendant whenever it is relevant to negative an element of the crime charged." *Williams v. Walker*, No. 92 CIV. 1905 (LBS), 1993 WL 22128, at *6 (S.D.N.Y. Jan. 26, 1993)(internal quotation omitted). In order to warrant such a charge, the record must "contain[] evidence of the recent use of intoxicants of such nature or quantity to support the inference that their ingestion was sufficient to affect defendant's ability to form the necessary criminal intent" and, importantly, "bare assertions by a defendant concerning his intoxication, standing alone, are insufficient." *People v. Sirico*, 17 N.Y.3d 744, 745 (2011).

In this case, as the trial court correctly found, there was insufficient evidence in the record to corroborate Petitioner's claim of intoxication. Although Petitioner contends that the police discovered a bottle of vodka and marijuana paraphernalia in his bedroom, such items are not evidence of the recent use of narcotics. *See People v. Rodriguez,* 76 N.Y.2d 918, 921 (1990) (intoxication charge not warranted where there was "no evidence of when defendant ingested narcotics, the quantity ingested or the effect they had on him"). As such, "[e]ven accepting at face value

petitioner's claim that he informed counsel that he was intoxicated on the night of his crimes, this Court is not convinced that counsel's failure to interpose a voluntary intoxication defense constitutes ineffective assistance of counsel." *Williams*, 1993 WL 22128 at *6.

For all the foregoing reasons, the Court finds that Petitioner has not shown that trial counsel's assistance fell outside the bounds of reasonable advocacy. Accordingly, Petitioner has not established that his trial counsel was constitutionally ineffective.

### E.    Ineffective Assistance of Appellate Counsel

Petitioner also contends that his appellate counsel provided ineffective assistance. In particular, Petitioner asserts that appellate counsel should have obtained certain photographs in evidence and failed to raise "meaningful errors" by trial counsel.

As a threshold matter, Respondent contends that Petitioner failed to exhaust this claim. Respondent notes that although Petitioner raised this claim in his *coram nobis* petition, he failed to seek leave to appeal the denial of that petition to the Court of Appeals. Respondent is correct.

It is well-established that a state inmate who seeks federal habeas review must first exhaust his available state court remedies. 28 U.S.C. § 2254(b)(1). This is so because "interests of comity and federalism dictate that state courts must have the first opportunity to decide a petitioner's claims." *Rhines v.*

*Weber*, 544 U.S. 269, 273 (2005).  "In order to satisfy the exhaustion requirement, a habeas petitioner must give the state courts a fair opportunity to review the federal claim and correct any alleged error."  *Ortiz v. Heath*, 2011 WL 1331509, at *6 (E.D.N.Y. Apr. 6, 2011).

A claim may be deemed exhausted where further review is procedurally barred under state law.  *See id.* ("[B]ecause the exhaustion requirement 'refers only to remedies still available at the time of the federal petition, it is [also deemed] satisfied if it is clear that the habeas petitioner's claims are now procedurally barred under state law.'") (quoting *Coleman v. Netherland*, 518 U.S. 152, 161 (1996)).  However, "[w]here a procedural bar gives rise to exhaustion . . . it also 'provides an independent and adequate state-law ground for the conviction and sentence, and thus prevents federal habeas corpus review of the defaulted claim.'" *Id.* (quoting *Netherland*, 518 U.S. at 162).  "For a procedurally defaulted claim to escape this fate, the petitioner must show cause for the default and prejudice, or demonstrate that failure to consider the claim will result in a miscarriage of justice, (*i.e.,* the petitioner is actually innocent)*."  Aparicio v. Artuz*, 269 F.3d 78, 90 (2d Cir. 2001).

Petitioner's failure to seek leave to appeal the denial of his *coram nobis* petition to the Court of Appeals renders his claims therein "unexhausted but deemed exhausted and procedurally barred." *Castro v. Fisher*, No. 04 CIV.0346 DLC AJP, 2004 WL 1637920, at *26

(S.D.N.Y. July 23, 2004). In accordance with the legal principles set forth above, Petitioner can therefore prevail on his ineffective assistance of legal counsel claim only if he can demonstrate cause and prejudice. He cannot do so.

First, Petitioner has offered no explanation for his failure to seek leave to appeal his *coram nobis* petition, stating merely that "[t]here is no right for an appellant to appeal a Writ of Error *Coram Nobis* to the New York Court of Appeals." Docket No. 11 at 13. Petitioner is incorrect. "In 2002, the New York Criminal Procedure Law was amended to allow permissive appeals to the New York Court of Appeals from the denial of coram nobis petitions." *Castro*, 2004 WL 1637920 at *26. Petitioner's misapprehension of the law regarding appeals of *coram nobis* petitions does not constitute cause for his failure to exhaust.

Second, Petitioner cannot show prejudice. His ineffective assistance of appellate counsel claim lacks merit. As set forth above, trial counsel was not ineffective in this case. Appellate counsel thus cannot be faulted for having failed to make a more expansive ineffective assistance of trial claim. Moreover, Petitioner has failed to show that appellate counsel possessed the photographs he allegedly failed to produce to Petitioner, or that he could have reasonably obtained them. The record shows that appellate counsel informed Petitioner that the photographs at issue had been retained by the trial court as exhibits and reviewed by the Appellate Division, but that he did not physically have copies.

Appellate counsel's failure to provide Petitioner with copies of photographs that he did not possess does not constitute ineffective assistance.

Because Petitioner can show neither cause nor prejudice, his ineffective assistance of appellate counsel claim is not reviewable by this Court. Petitioner therefore is not entitled to federal habeas relief on this basis.

### F.    *Miranda* **Waiver and Voluntariness of Statements**

Petitioner's next argument is that his *Miranda* waiver was not effective and that his statements to the police were therefore involuntary.  This argument lacks merit.

With respect to Petitioner's waiver of his *Miranda* rights, such rights are voluntarily relinquished "when the relinquishment is the product of a free and deliberate choice rather than intimidation, coercion, or deception." *United States v. Male Juvenile (95-CR-1074)*, 121 F.3d 34, 41 (2d Cir. 1997) (internal quotation omitted).  "For a waiver to be voluntary, the waiver must have been the product of a free and deliberate choice rather than intimidation, coercion, or deception." *United States v. Guzman*, 879 F. Supp. 2d 312, 320 (E.D.N.Y. 2012) (internal quotation omitted).  The accused need not understand all the possible consequences of a waiver, so long as he is aware that "he may choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time." *Colorado v. Spring*, 479 U.S. 564, 574 (1987).

"Whether a waiver is 'knowing and voluntary' is a question directed to a defendant's state of mind, which can be inferred from his actions and statements." *United States v. Spencer*, 995 F.2d 10, 11 (2d Cir. 1993). "[T]he question of waiver must be determined on 'the particular facts and circumstances surrounding [the] case, including the background, experience, and conduct of the accused.'" *Id*. (quoting *North Carolina v. Butler*, 441 U.S. 369, 374-74 (1979)). The Supreme Court has expressly held that the "totality-of-the-circumstances approach is adequate to determine whether there has been a waiver even where interrogation of juveniles is involved." *Fare v. Michael C.*, 442 U.S. 707, 725 (1979).

Here, Petitioner was told at the outset of questioning that he was not under arrest and that he was free to leave. He was also provided with his *Miranda* warnings. Petitioner individually confirmed that he understood each of his rights and confirmed that he wished to waive them. Petitioner testified at trial that he had in fact told the police that he understood his rights, though he went on to claim that he had done so only out of a desire to be cooperative. Moreover, while the questioning lasted for several hours and went into the next morning, the police never threatened or coerced Petitioner, and he was offered food, water, and restroom breaks. The police also reminded Petitioner of the *Miranda* warnings before producing the final, typewritten statement.

It is true that Petitioner was only 16 at the time of his arrest and that he was unaccompanied by a parent. "[A]n arrestee's juvenile status and the absence of a parent are certainly important factors that must be considered in assessing the voluntariness of a juvenile's statement." *United States v. Guzman*, 879 F. Supp. 2d 312, 321 (E.D.N.Y. 2012). However, those factors alone are insufficient to demonstrate that a waiver was involuntary. *See Fare*, 442 U.S. at 723-727 (declining to find that a 16 year old's waiver of his *Miranda* rights in the absence of a friendly adult was *per se* involuntary). Instead, there must be other factors tending to show that the waiver was involuntary. Such factors are absent in this case.

Petitioner's personal characteristics support the conclusion that his waiver was knowing, intelligent, and voluntary. There is no evidence that Plaintiff is intellectually impaired. To the contrary, school records submitted by Petitioner in connection with his § 440.10 motion show a full scale IQ of 96, in the average range of functioning. Petitioner's psychiatric and behavioral problems do not show that he was incapable of understanding his rights. *See Male Juvenile*, 121 F.3d at 40 (finding juvenile's waiver of *Miranda* rights voluntary where "psychological reports indicate that defendant has a host of attentional and learning disabilities," but "nothing in the . . . psychological reports indicates that defendant could not comprehend the rights that were explained and read to him"). Moreover, Petitioner had previous

dealings with the legal system, having been ordered into rehab by a family court judge.

Petitioner notes that he had been agitated earlier in the evening when Ashlee was not permitted to accompany Austin in the ambulance. However, the record shows that Petitioner had calmed down by the time he was provided with his *Miranda* warnings. Indeed, after having calmed down and traveled to the police station, Petitioner waited for roughly an hour before speaking to Detective Graham. His earlier agitation does not show that he was incapable of understanding the *Miranda* warnings after having had time to regain his composure. For all these reasons, and taking into account the totality of the circumstances, including Petitioner's age and the absence of a friendly adult, the Court finds that the Appellate Division's determination that Petitioner's statements were voluntary was reasonable.

There is also no merit to Petitioner's contention that the police should have provided him *Miranda* warnings an additional time when he stated that he was uncomfortable saying aloud what had happened and asked to write it down. First, the Appellate Division correctly noted that Petitioner had failed to preserve this contention, because he did not raise it before the trial court. *See Schumaker*, 136 A.D.3d at 1373. As such, the Appellate Division's rejection of this argument rested on an independent and adequate state law ground and is not subject to review by this Court.

Second, Petitioner's argument is without merit in any event. "[W]here a person in police custody has been issued *Miranda* warnings and voluntarily and intelligently waives those rights, it is not necessary to repeat the warnings prior to subsequent questioning within a reasonable time thereafter, so long as the custody has remained continuous[.]" *Cooper v. Graham*, No. 10-CV-6467 MAT, 2011 WL 5597356, at *4 (W.D.N.Y. Nov. 17, 2011) (internal quotation omitted) (finding a 13 hour gap between waiver and statement reasonable). In this case, approximately two hours elapsed between Petitioner's waiver of his rights and his production of the handwritten statement. This time gap is reasonable and no repetition of the *Miranda* warnings was required.

The Appellate Division's determination that Petitioner's waiver of his rights and subsequent statements to the police were voluntary was neither contrary to nor an unreasonable application of clearly established federal law. Accordingly, Petitioner is not entitled to federal habeas relief on this basis.

### G. Additional Due Process Claims

Petitioner's final argument is that he was denied due process of law, because of (1) the admission of prejudicial uncharged prior bad acts (namely, his fight with Ashlee the night before Austin's death), (2) the use of evidence that was not marked for identification, (3) the knowing use of perjured testimony by the prosecution, and (4) the display of the victim's body and injuries at trial and in summation. The Court has considered each of these

contentions and, for the reasons discussed below, finds them without merit.

### 1. Admission of Uncharged Prior Bad Acts

Petitioner contends that the trial court erred in admitting evidence of his fight with Ashlee on March 18, 2013. The Appellate Division rejected this claim, explaining that Petitioner had consented to the admission of this evidence. *See Schumaker*, 136 A.D.3d at 1373. The record supports this finding by the Appellate Division, which constitutes an independent and adequate state law ground for denial of this claim, as discussed above.

Moreover, "state trial court evidentiary rulings," such as the admission of prior uncharged crimes, "generally are not a basis for habeas relief." *Vega v. Walsh*, 669 F.3d 123, 126 (2d Cir. 2012) (finding that trial court's admission of evidence of uncharged crimes was not contrary to or an unreasonable application of federal law). Here, the evidence at issue was admissible, inasmuch as it provided necessary background information that arguably showed Petitioner's motive (namely, his anger at the child's mother and belief that she spoiled Austin). As such, no due process violation occurred.

### 2. Use of Evidence Not Marked for Identification

Petitioner claims that while cross-examining him at trial, the prosecution used evidence that had not been admitted nor marked for identification. The evidence Petitioner is referring to is his verbal statement to his mother that, as a 16-year-old blond, he

would probably just need to cry in front of the jury and they would feel sorry for him. Petitioner first raised his claim that his verbal statement to his mother needed to be moved into evidence in his *coram nobis* petition which, as discussed above, he failed to fully exhaust. As such, he must show both cause and prejudice in order to obtain relief. He can show neither.

First, as discussed above, there is no cause for Petitioner's failure to exhaust the claims raised in his *coram nobis* petition. Second, this claim is meritless on its face. Verbal statements are not physical pieces of evidence, and they do not need to be marked for identification prior to being referred to at trial. Petitioner's misunderstanding of the rules of evidence does not establish a due process violation.

### 3. Knowing Use of Perjured Testimony

Petitioner's next due process claim is that the prosecution knowingly used perjured testimony. Specifically, Petitioner claims that the prosecution permitted Ashlee to testify that her father and step-father found an unused condom in her bed when it was actually a used condom they had discovered. Petitioner raised this claim in his § 440.10 motion, and it was rejected by the trial court, which noted that Petitioner had failed to establish that Ashlee's testimony was false.

The trial court's rejection of this claim was sound. A mere inconsistency in testimony does not "give[] rise to an inference that the prosecution suborned perjury." *United States v. Romano*,

516 F.2d 768, 771 (2d Cir. 1975).  Petitioner has not shown that the prosecution had any independent knowledge of the circumstances regarding Ashlee's departure from her father's house, or of Ashlee's sexual relationship with Petitioner.  Under these circumstances, there is no basis to conclude that the prosecution made use of testimony it knew was perjured.

### 4.  Display of the Victim's Body and Injuries

Petitioner's final contention is that the prosecution's display of photographs of Austin's body and injuries during the trial and summation was unduly prejudicial.  Again, Petitioner raised this claim in his unexhausted *coram nobis* petition.  He therefore must show cause and prejudice, and cannot meet that burden.

The issue of cause has been addressed previously, and the Court need not repeat its analysis here.  Turning to the issue of prejudice, Petitioner's claim is without merit.  Under New York law, "[a]dmission of photographs of homicide victims is generally within the discretion of the trial court.  Where they are otherwise properly admitted as having a tendency to prove or disprove some material fact in issue, photographs of a corpse are admissible even though they portray a gruesome spectacle and may tend to arouse passion and resentment against the defendant in the minds of the jury."  *Kimble v. McGinnis*, 651 F. Supp. 2d 41, 49 (W.D.N.Y. 2009) (internal quotation omitted).  This state evidentiary rule comports with due process and was properly applied in this case.  The

severity of Austin's injuries, as illustrated by the photographs, was directly relevant to the material issue of Petitioner's intent. Accordingly, no due process violation occurred.

## IV. Conclusion

For the foregoing reasons, the petition (Docket No. 1) is denied and dismissed. No certificate of appealability shall issue because Petitioner has not shown "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether th[is] . . . [C]ourt was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3) and Fed. R. App. P. 24(a)(3), that any appeal from this Decision and Order would not be taken in good faith, and therefore the Court denies leave to appeal as a poor person. *Coppedge v. United States*, 369 U.S. 438, 445-46 (1962). Any application for leave to appeal *in forma pauperis* must be made to the Second Circuit Court of Appeals in accordance with Fed. R. App. P. 24(a)(1), (4), & (5). The Clerk of the Court is instructed to close this case.

**ALL OF THE ABOVE IS SO ORDERED.**

s/Michael A. Telesca

_____
HONORABLE MICHAEL A. TELESCA
United States District Judge

DATED:    Rochester, New York
          June 28, 2018